ALBERT VERDINI, an Infant, by FLORA VERDINI, His Guardian ad Litem, Respondent, *v.* INTERBOROUGH RAPID TRANSIT COMPANY, Appellant.

First Department, June 11, 1920.

**Street railways — injury received by falling from subway platform in front of train — invitee — verdict not supported by weight of evidence.**

In an action to recover damages for personal injuries it appeared that the plaintiff, an employee of the owner of a news-stand outside the entrance to one of defendant's subway stations, while returning from the subway ticket office to the news-stand after having purchased tickets for the stand, either fell or was pushed off the station platform and was injured; that the plaintiff's employer sold tickets for the subway at one entrance in pursuance of an agreement between his landlord and the defendant; that the plaintiff was permitted to pass through the gate onto the platform for the purpose of buying tickets without paying any fare.   On all the evidence, *held*, that the plaintiff was not a mere licensee, to whom the defendant owed no duty of active vigilance and care to see that he was

not injured, but that he was an invitee, towards whom defendant was bound to exercise reasonable prudence and care measured by the circumstances of which the defendant was aware.

The finding that the station platform was crowded at the time of the accident and that the plaintiff was pushed therefrom by the surging of the crowd is against the weight of the evidence.

APPEAL by the defendant, Interborough Rapid Transit Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 7th day of May, 1919, upon the verdict of a jury for $20,000, and also from an order entered in said clerk's office on the 4th day of May, 1919, denying defendant's motion for a new trial made upon the minutes.

*J. Ralph Hilton* of counsel [*James L. Quackenbush,* attorney], for the appellant.

*Edward J. McCrossin* of counsel [*R. Percy Chittenden,* with him on the brief], for the respondent

DOWLING, J.:

This action is brought to recover damages claimed to have been sustained through the negligence of defendant in allowing and permitting its platform at the Wall Street station of the Broadway route to become overcrowded, and in failing to maintain any railing or appliance in common use to prevent passengers and others having occasion to be lawfully upon said platform from being pushed therefrom.

Plaintiff on February 15, 1917, was employed by Abraham Charney, who conducted a news-stand in the lower hallway of the building 111 Broadway, in the borough of Manhattan, city of New York, which hallway leads to one of the entrances to the Wall Street station of defendant's subway. Plaintiff was then thirteen years of age, and had worked for Charney for a month, delivering papers for him and as part of his duties buying subway tickets for him at the main ticket booth of the Wall Street station at the other end from the news-stand. Since 1911 Charney has been selling subway tickets at his stand. There was one of defendant's " ticker choppers " three feet from the stand but there was no place provided by defend-

ant to sell tickets at this entrance, so the tickets had to be bought at Charney's stand. This had been so since 1911, and Charney bought his tickets at the main ticket office at the other end of the Wall Street station platform and resold them to his customers or any one else desiring to use this entrance to the trains. To get these tickets Charney or his employee went past the ticket chopper near his stand, without paying any fare or depositing any ticket, walked along the station platform to the main ticket booth, there bought the tickets and returned by the same route to the stand, which is outside the ticket-chopping stand. Charney had shown plaintiff how to buy the tickets for him and as he passed the ticket box for the first time Charney told the defendant's ticket taker that plaintiff was his boy working for him, so he could proceed to get the tickets in the usual way.

On the day in question shortly after four P. M. plaintiff left Charney's stand to buy subway tickets for him. Charney gave him twenty-five dollars for that purpose. Plaintiff followed his usual procedure when sent to buy tickets. He passed the ticket chopper without depositing any ticket and went out on the station platform, walking along the same until he reached the ticket booth and bought twenty-five dollars worth of tickets. He started to go back to his place of employment but found the crowd was growing larger, so he walked where there were the fewest people which was about two and one-half or three feet away from the edge of the platform. He testified that he " kept on walking and little by little the crowd started coming out and making me go nearer the edge. When I come near this narrow point I was about a foot or a foot and a half away from the edge of the platform." Then " the crowd gave a sudden push which knocked me off the platform on the tracks," and the train ran over him. It was a south-bound train, and plaintiff, who was facing north on his return from purchasing the tickets, looking straight ahead, heard the train approaching. After he fell, it was three or four seconds before he was hit. As the result of the accident plaintiff has lost his left arm and sustained other injuries. As he left the hallway at 111 Broadway he noticed they had been building a tunnel, and there was lumber on the platform extending out about three feet for a distance

of twenty-five or thirty feet to the south.    Plaintiff indicated on the diagram of the northerly end of the station the place where he claimed to have been pushed off the platform. This point was south of the last column shown as adjoining the track, and at a place where there was no railing.    Plaintiff is corroborated as to the location of the accident by the testimony of the witness Johnson, who indicated the spot where plaintiff was taken from under the train as a short distance south of the place described by plaintiff.

The subway station platform at Wall street on the west side of Broadway is four hundred and eighty-six feet long and of varying width, from twenty-three feet to thirteen and one half feet.    At the point where plaintiff claims he was forced off, the platform is eleven and three-tenths feet wide. At the northerly end there are iron railings eighteen or nineteen inches from the edge of the platform, and put up in five sections, extending to a point about one hundred and ten feet south of the northerly end of the platform.

While plaintiff claims that he was forced off at a point about thirty-two feet south of the end of the last railing, the motorman in charge of the train claims that plaintiff was running or jog-trotting along the outer edge of the platform between the guard railing and the edge, and that he came through one opening running north, and in swinging himself through the next entrance missed his grip and fell from the edge of the platform in front of the train about one-half car length away.    He indicated on a photograph the place where he claimed plaintiff fell from the platform, and this is between the openings separating two sections of railing and just beyond the end of one railing.    The conductor of the train also testified that he had to get down between the railings to reach the spot where the boy's body was found when the train stopped.    To the same effect was the testimony of the defendant's witness Applebaum.    There was a conflict of evidence as to where the accident actually happened, but I think the finding was warranted that it occurred at the spot fixed by plaintiff and that there were no railings at or near that point.

I believe also that the testimony warrants the finding that plaintiff was not a mere licensee, to whom they owed no duty

of active vigilance and care to see that he was not injured, but that he was an invitee, towards whom defendant was bound to exercise reasonable prudence and care measured by the circumstances of which defendant was aware. (*Quinn* v. *Staten Island R. T. R. Co.*, 224 N. Y. 493.) Plaintiff was engaged in the lawful business of Charney, his employer, which was of interest both to Charney and the defendant. From 1911 Charney, a tenant of the 111 Broadway Corporation, had been selling subway tickets at his news-stand, which was the only place where they could be bought for this particular entrance to the subway platform. He had always bought his tickets in bulk at the main subway ticket booth, to the south, either in person or by his employees, and they passed by the ticket chopper, neither giving nor being asked to give a ticket. Charney's sale of tickets may have helped his sale of papers, but it was the duty of the 111 Broadway Corporation under an agreement in writing entered into with the Rapid Transit Subway Construction Company and the Interborough Rapid Transit Company to pay for the construction of the tunnel leading to the north end of its subway station from its building, and also to pay the expenses of a ticket chopper and to sell tickets. This was the tunnel in which Charney had his stand. The obligation to pay for the construction of a tunnel was met; and the 111 Broadway Corporation paid to the other parties to the agreement the sum of $8,000, which was " supposed to produce enough income amortized within a reasonable time to pay his salary " of the ticket chopper, who was hired and discharged by defendant. The sale of subway tickets by Charney was the fulfillment of the last requirement of the three cited, so neither Charney nor his employee was a volunteer, a trespasser or a mere licensee. They were invitees when engaged in the purchase of subway tickets.

Defendant's negligence is predicated on three assigned grounds:

(1) Undue crowding of the platform.

(2) Failure to provide railings.

(3) Negligent operation of the train.

There is no evidence warranting a finding that the train was negligently operated. The negligence in failing to provide

railings must depend in this case upon the condition of the station platform, for if that was not overcrowded there was no reason or excuse for plaintiff walking along the very edge of the platform on his return to the news-stand, and he would have been guilty of contributory negligence in voluntarily placing himself unnecessarily in a position of danger, where a misstep would have thrown him to the tracks, with the obvious risk to life and limb attending the same. And plaintiff's reason for going out on the edge of the platform, as he claims, is that the crowd was so great that he had to walk there. There is some evidence of a rather vague character as to an obstruction by the placing of lumber for some distance near the wall of the station, but it does not appear that it had any effect in congesting the platform or preventing plaintiff walking on the inner side of the crowd (if there was one) rather than on the outer. Nor is there any evidence that this particular station platform was usually crowded, or that it was dangerously overcrowded at particular hours, or that defendant had any reason to believe that there was such a danger of overcrowding as required the installation of any appliances or devices to prevent accidents due to that cause. In fact, it was not established that the erection of railings along the entire length of this platform, so far as feasible, would have obviated the dangers of overcrowding, if such existed.

But the turning point of this case is whether, in fact, the station platform was crowded at the time the accident occurred to plaintiff, and whether plaintiff was forced off the platform on the track as the result of the surging movement or jostling of a crowd against him. In my opinion, the finding to either effect is against the weight of the evidence. This platform was 486 feet long by a width varying from $23\frac{3}{10}$ feet to $11\frac{3}{10}$ feet. Plaintiff testified that when he first went on the platform passengers were " coming in more and more each time. The crowd was getting bigger and bigger." When he started to come back, the " crowd was getting greater and greater, bigger and bigger." He walked " where there was the least people, that was about two and a half or three feet away from the edge of the platform." Then he proceeded to testify that the crowd started to come out, made him go

nearer the edge, and finally gave a sudden push which knocked him off the platform. On cross-examination he said that he had walked about 50 feet on his way back from the ticket office when the crowd gave a sudden push as he heard the train approaching from the north. Plaintiff's witness Johnson was a passenger on the train which ran over plaintiff. He says that when the train stopped and he looked out he " saw a crowded condition on the platform." He went down on the track despite his knowledge that it was dangerous there because of the third rail, and saw a person coming from under the train with the boy in his arms. He saw it would have been impossible to have carried the injured boy through the crowd, so he helped to get the crowd back. He says he kept the crowd back for ten or fifteen minutes, until an ambulance man arrived with a stretcher. He testified there was a jamb around the boy; that the platform around the first car was crowded with people. He fixes the number of people on the platform when he looked out, immediately after the train stopped, at 200, who were very close together and extended down for some distance, at least 50' to 60 feet on each end, on both sides of the entrance and also at the main entrance, and extending in all over a length of 100 feet. But this was after the accident occurred, and it does not appear how many of them came from the train itself, which had stopped, when the emergency brakes were applied. Plaintiff's employer, Charney, was unable to tell how many people were on the platform when he sent plaintiff to buy the tickets; he "didn't count the passengers going in, but they were in a great number;" they increased thereafter until he went out on the platform and found plaintiff had been hurt. The traffic is heavier on a rainy than on a clear day, and on this day it snowed from two-forty-two P. M. until eleven-fifteen P. M.

For the defendant, the conductor of the train, Hunt, testified that when the train stopped after the accident, he walked back from the front thereof, seventy-five feet, and saw only one person on the platform, until the passengers flocked out of the first three cars of the train. He saw Carey, the motorman, who lifted the boy out from under the train after he had tried to get the power shut off. Hunt ran down the platform

to telephone to the trainmaster to get the power properly shut off and his progress was impeded by no crowd; there was no congestion of people that stopped his progress in the couple of hundred feet that he ran. Quite a number of passengers came out of the cars. On cross-examination he said that when he got on the platform he saw no crowd there, but only one man. He testified that the seats were all occupied in the first two cars of the train, which would mean about 100 people. Defendant's witness Applebaum, a passenger on the train in question, testified that when he left the third car thereof he saw no one where he got out, but on making his way towards the second car he saw very few people on the station platform. He saw " a few people coming from the ticket agent's office, or from that direction." There were no people to obstruct his view. On cross-examination he said that when he stepped out on the platform he did not believe there were more than a dozen people there, and they were between the first platform of the third car and the first platform of the first car. He said that when the boy was brought out from under the train there were about thirty people there. The ticket taker, Jaeger, testified that for the fifteen or twenty-five minutes he was selling tickets at the time in question he sold 500 tickets to the plaintiff, 200 to the Empire Building and 100 to passengers. Trains ran regularly during that time on four minutes headway. This witness shut off the power after the accident, and he says that as he crossed the platform to do so, he had a full view of the entire platform and there were then fifty to seventy-five people thereon. Witness Dorfman said that on the day in question between the hours of three and four P. M. approximately, 1,000 tickets were sold. Witness Lynn testified that he was tower-man at the time in question and that from three-forty-five P. M. until four-fifteen P. M. trains passed south down Broadway at intervals of two minutes. Witness Dobrer, who was the ticket chopper near Charney's stand, testified that the traffic was very quiet by his box at the time in question and the real rush did not start until five P. M.; that it was not very crowded around four P. M. Carey, motorman of the train, testified that as he approached the platform he saw but one passenger and there were very few people thereon when he left his cab and went out on the platform. He brought the boy from under

the train and at that time there were a few passengers who came around to see what the trouble was. On cross-examination he said the one passenger he saw waiting for the train was a woman, standing close to the wall.

The allegations of the complaint upon the subject of overcrowding are:

" IV. Upon information and belief, that at the times hereinafter mentioned and for a long time previous thereto, passengers were invited upon the said Wall Street station for the purpose of boarding its trains at said point, and a ticket office was maintained at said place and at times passengers congregated upon said station in great numbers.

" V. Upon information and belief, that heretofore and at the times hereinafter mentioned the defendant well knowing that during certain hours of the day said station becomes overcrowded with passengers and well knowing the size and width of said platform and the dangers incident to overcrowding the same and the likelihood of passengers and others having occasion to be lawfully upon said platform being pushed from the edge of said platform to the tracks, it negligently and carelessly failed to adopt any rail or device in common use, fastened and secured along the edge of said platform adjacent to the tracks for the purpose of preventing passengers and others having occasion to be lawfully upon said platform from being pushed therefrom."

" VIII. Upon information and belief, that at the time and place aforesaid and through no fault or negligence on the part of plaintiff, or on the part of his parents and guardians, and solely through the negligence of the defendant as hereinbefore alleged, and through its negligence in allowing and permitting its said platform to be overcrowded," as well as through its negligence in failing to maintain a railing or other appliance, plaintiff sustained the damage for which he sues.

Plaintiff failed to sustain any of these allegations, and failed as well to prove, by a fair preponderance of the evidence, that the station platform at the time in question was crowded, overcrowded or dangerously crowded, and as well failed in like manner to prove that he was pushed to the tracks by the pressure or movement of a crowd of persons upon such platform.

The judgment and order appealed from must, therefore, be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., MERRELL and GREENBAUM, JJ., concur

SMITH, J.:

I concur in the reversal of the judgment and vote for dismissal of the complaint on the ground that the plaintiff was a mere licensee.

Judgment and order reversed and new trial ordered, with costs to appellant to abide event.